## JAMES BARNETT

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

1. DYING DECLARATIONS—*when admissible.* On the trial of a party on a charge of manslaughter, the dying declarations of the deceased in respect to the alleged crime, are admissible in evidence against the accused.

2. To render such declarations admissible, however, the party making them must be free from mental aberration, and must be under the belief that his dissolution is near at hand, and without hope of recovery.

3. TESTIMONY *of deceased witness—proof thereof.* The rule in regard to the proof of the testimony given on a former trial, by a witness who has since died, is the same in civil and criminal cases. So, upon the trial of a party on a charge of manslaughter, it was held competent for the prosecution to prove by persons who heard and remembered it, the testimony of a witness on the preliminary examination before a justice of the peace, such witness having died before the final trial.

4. CRIMINAL LAW—*conviction for manslaughter on an indictment for murder—effect of a new trial.* Where a party has been tried on an indictment for murder and convicted of manslaughter, that is an acquittal on the charge of murder; and if, in such case, a new trial be granted, the accused can not be put upon his trial again for murder, but only for manslaughter.

5. And upon the second trial in such case, the court may properly instruct the jury, for the prosecution, that *if* they believe the accused guilty of murder, that, of itself, will not justify them in acquitting him of manslaughter, inasmuch as the law only regards him as guilty of manslaughter. In ordinary cases, however, such an instruction would be erroneous.

WRIT OF ERROR to the Circuit Court of Gallatin county ; the Hon. ANDREW D. DUFF, Judge, presiding.

At the August term, 1863, of the circuit court of Saline county, James Barnett was indicted for the alleged murder of John Seets. The cause was continued from term to term, until the April term 1866, when a trial was had, resulting in a verdict of guilty of manslaughter, and thereupon a new trial was granted. At the September term, 1866, the cause was removed into the circuit court of Gallatin county on change of venue. A second trial was had at the May term, 1869.

The testimony given as the dying declarations of deceased, is all that is necessary to be stated here. On that subject *George Aydelotte* testified: " On the day the homicide was committed, I saw John Seets on the side of the road, lying down. He was wounded, and had been brought to that place from somewhere toward Equality. He had been hauled in a wagon as long as he could bear it, and was then taken out and laid by the roadside. He was badly wounded, having been stabbed in the side, and was very weak from loss of blood and from the dangerous nature of the wound. He was taken to the house of George Aydelotte, my cousin, on a sled. Seets said he would die. I told him not to be alarmed, that I thought he would get well. He said no, that he would die. Seets said James Barnett had stabbed him, and done it with his (Seets') own knife. I went for a doctor. Seets lingered until next morning about eight o'clock, and died. Deceased made no disposition of his property, or any arrangement for death, within my knowledge. I was not with him much of the time from the time he was stabbed until his death. I was

with him at the time he died, waiting upon him, alone. At that time he told me he must die, and that James Barnett had stabbed him with his own knife. He was then bleeding very much, and appeared to be in great pain. I do not know whether he made any disposition of his property or not, or any preparation for death."

*Cassandra Aydelotte* testified: "On the day of the homicide I heard that John Seets was out on the road, wounded, and I went down the road and found him lying by the road, wounded. He said he was wounded, and that James Barnett had killed him, and he wished me to take care of his children. He was taken to my house. He was praying, and said he would die. After he was taken to my house, I heard part of a conversation between Seets and Hubb, a neighbor. I heard deceased say to Hubb that James Barnett killed him—that he stabbed him with his own knife, and that he did it for nothing. Deceased was in great misery, and died the next morning about eight o'clock. The children of deceased were then living with me. He made no disposition of his property, and said nothing further about his affairs. He prayed a good deal of the time."

*Angeline Alexander* testified: "I was present with John Seets on the night before his death. He was wounded and seemed very low, and did not talk much. I heard him say that night, that James Barnett killed him, and that he did it without any provocation, and with his (Seets') own knife. Seets was badly wounded, and died the next morning about eight o'clock. He prayed a good deal, and seemed to be fully conscious that he was near his death."

*William Pinkston* testified: "I found John Seets lying by the side of the road on the day the homicide was committed. He was suffering from a wound, and seemed to be in a suffering state. Seets said that James Barnett had stabbed him, and that he would die. He did not say when he would die. Made no arrangements, within my knowledge, in respect to his property."

This was all the testimony in reference to the dying declarations of deceased.

The trial resulted in a verdict of guilty, and fixing the punishment a term of ten years' confinement in the penitentiary.

The defendant thereupon sued out this writ of error.

Mr. WILLIAM G. BOWMAN and Mr. JAMES B. TURNER, for the plaintiff in error.

Mr. WASHINGTON BUSHNELL, Attorney General, for the People.

Mr. JUSTICE WALKER delivered the opinion of the Court:

It is urged that the evidence in this case fails to sustain the verdict of the jury; that it does not establish the guilt of accused beyond a reasonable doubt, or that Seets was killed at the time and place charged. It appears, from the evidence, that there was no reasonable doubt of enmity existing between deceased and accused before the death of the former, and that they left town in the same wagon. Just before they left, accused stated, he had learned that Seets had threatened to whip him, and was then advised not to go with him, as there were two of the Seets', but he affirmed he would go, as his son was with him. In the afternoon of the same day, and after they had left town together, and but a short time afterwards, deceased was found by the roadside, stabbed in the left side, from which wound he afterwards died. The evidence shows that deceased had with him and on his person, a butcher knife, in a belt.

Just before his death, Seets stated that James Barnett had stabbed him with his own knife, and when accused was arrested he threw a knife behind him, to his son, answering the description of the knife carried by deceased. Again, when the party came to arrest him, the next day, he said he knew their business. This evidence all points strongly, if not conclusively,

to plaintiff in error as the guilty party. If considered alone, it would be of the very highest character of circumstantial evidence, even if the dying declarations were not considered.

But it is sought to establish a doubt on the dying declarations, as the son of accused accompanied him, and bore the same name as his father. He was a lad of about sixteen years of age, and of ordinary size, and was generally called by a different name. It is urged that the statement, that James Barnett had stabbed him, might as well apply to the son as the father, they both bearing the same name, and thus creating a doubt as to which of the two the accusation was intended to apply. If this was all the evidence in the case, then it might be that there would be a doubt. But the other circumstances of the case free it from such a doubt. No motive is shown to render it probable that the son did the act. No quarrel is shown to have existed between deceased and the young man, nor is any reason assigned why we should infer that he is guilty. Human experience shows that sane persons never commit such acts, unless impelled by strong motives. Had any existed to induce the lad to kill deceased, it would have manifested itself before or after the homicide. There is no evidence in this record to create a reasonable probability that the son perpetrated the crime, but, on the other hand, all the evidence points directly to the father.

It is next insisted that the dying declarations of deceased were not admissible as evidence. In answer to this declaration it is only necessary to say, that in numerous similar cases determined by this court, it has been deliberately held that they are admissible when made in the manner required by the rules of evidence. To be admissible, the party making them must be under the belief that his dissolution is near at hand, and without hope of recovery, and the party must be free from mental aberration. The evidence shows that deceased was entirely conscious, and fully impressed with the fact that his death was certain and was near at hand. They were made under such circumstances as rendered them competent evidence,

and they were properly admitted. The case of *The Chicago & Great Eastern Railraad Co.* v. *Marshall,* 48 Ill. 475, was a civil action. In that case, in accordance with the common law rules and practice, it was held that such declarations were not admissible in civil cases, but it in nowise limited its application to criminal cases, as had been previously determined by this court. That case has no bearing on this.

It is next urged, that the court below erred in admitting evidence of what Hardy Seets swore at the examination of the prisoner before the justice of the peace. Hardy Seets was dead when this case was tried in the court below, but the witness heard and remembered his testimony. The rule as to the admissibility of evidence is the same in civil and criminal trials, except, in the latter, dying declarations may be received. *Watson's case,* 2 Starkie's R. 155; Roscoe's Crim. Ev. 1. Nor does the supposed constitutional objection arise to such evidence, as the witness was confronted with the accused, and he was afforded an opportunity of cross examination in the examining court. On a trial in the United States circuit court, before Mr. Justice Washington, in a capital case, the evidence of a deceased witness was proved and no objection taken to its admissibility. *United States* v. *Wood,* 3 Wash. C. C. R. 440. And in the case of *Iglehart* v. *Jernegan,* 16 Ill. 513, it was held that the substance of what a deceased witness testified to on a former trial was admissible, and the precise words used by the witness need not be proved. And this is the rule announced in other cases determined by this court. This is, however, the first time the question has been presented in a case of homicide, but the rule being the same as to the admissibility of this character of testimony in civil and criminal cases, as we have seen, there was no error in admitting this evidence.

It is next insisted, that the court below erred in giving the first of the people's instructions, because, it is urged, it was calculated to mislead the jury. A careful inspection of the instruction fails to render the objection apparent. It informs

the jury that if they believe, from the evidence, that the defend-
ant was guilty of murder, that would not justify them in acquit-
ting him of manslaughter, as in such case, the law only regarded
him as guilty of manslaughter. In ordinary cases, this instruc-
tion would be erroneous, but it must be considered in the
light of this record. When we see, from the record, that
accused had been previously tried under the same indictment,
and had been convicted of manslaughter, and acquitted of
murder, the meaning and propriety of the instruction are
obvious, as a party can not be tried a second time for the same
offense. He could not be convicted on this trial for murder,
but a new trial having been granted on the conviction for
manslaughter, he might be, and was, properly tried again for
the latter named crime. And although the proof might show
that the crime was perpetrated deliberately and with malice,
still, after such an acquittal, the conviction could only be for
the lower grade of crime. This rule was announced in the
case of *Brennan* v. *The People*, 15 Ill. 511, and governs the
case at bar.

The objection taken to the fifth of the people's instructions,
is disposed of in the consideration we have given to the evi-
dence of dying declarations. In holding them to be admissi-
ble, it follows that the instruction was proper, and disposes of
that question. Nor do we perceive any objection to the sixth.
It correctly informed the jury, that if they believed that
deceased was of sound mind and fully impressed with the belief
that he would die in a short time, when he made the declara-
tions, that such declarations would be entitled to the same
weight as if they had been made under the sanction of an
oath. This is the substance of the instruction, which is mani-
fest from its inspection, and it but announces the law which
permits such evidence to be given, because the apprehension
of immediate dissolution is presumed to be fully as impressive
as the solemnity of an oath. It does not pretend to determine
whether they should give much or little weight to the evidence,
but such weight as they would have given had deceased been

present and sworn to the same facts. We do not see that this instruction was calculated to mislead the jury.

We are unable to perceive any error in this record, and the judgment of the court below must be affirmed.

*Judgment affirmed.*